COMMONWEALTH *vs.* WILLIAM SULLIVAN. January 20, 1984. *Homicide. Evidence,* Reputation, Opinion. *Self-Defense. Practice, Criminal,* Judicial discretion.

On the weekend before the shooting which led to the defendant's conviction of manslaughter, the victim had beaten up the defendant. The victim and the defendant were brothers-in-law. There was evidence that the defendant vowed vengeance. To that end the defendant, accompanied by his brother, who was armed with a shotgun, turned up at the victim's apartment past midnight on Saturday, October 17, 1981. The defendant announced his late night call on the victim by kicking down the door while his brother poked the shotgun through a window of the victim's living room. The bare hands fight which ensued escalated into fatal use of the shotgun by the defendant.

1. The judge was well within his discretion in denying the defendant's motion to obtain the criminal record of the victim. Mass.R.Crim.P. 14(a) (2), 378 Mass. 874 (1979). In view of the beating the defendant had received from the victim a week earlier and the evidence of armament maintained by the victim, including wooden cudgels, a knife and sword, but not firearms, it was already established that the victim was not wont to turn the other cheek. On top of several defense witnesses who testified about the victim, what was sought from the victim's record would have added little to the showing already made of his reputation for being violent or quarrelsome. Cf. *Commonwealth* v. *Dilone,* 385 Mass. 281, 285 (1982). Evidence of particular acts of a person are, in any event, not evidence of general reputation for violence. *Commonwealth* v. *Roberts,* 378 Mass. 116, 129 (1979). *Commonwealth* v. *Lacasse,* 1 Mass. App. Ct. 590, 595 (1973).

2. As requested, the judge instructed the jury on the defense of coming to the aid of another and, in doing so, read extensively from *Commonwealth* v. *Martin,* 369 Mass. 640, 649 (1976). After quoting from that case, the judge attempted a simplification in which he said, in substance, that if the defendant saw that serious violence to his brother was imminent, the defendant could assert the principle of self-defense on behalf of the threatened brother. Earlier the judge had charged on self-defense. The defendant argues that, by employing the words "self defense" in his explanation of the defense of another principle, the judge incorporated in the latter principle the idea that the defendant had to take reasonable

means to avoid combat. The argument requires a tortured reading of the judge's instruction and drawing from it a meaningless message. As described by the judge, coming to the aid of another involves intervention and necessarily is irreconcilable with retreat. The defendant's construction is also meaningless if applied to his account of the facts. That version was that the victim was pursuing the defendant's brother with a stick of baseball bat proportions, shouting, "I'm going to kill you, Bob." If that were believed, retreat was scarcely an option for the defendant, if he were concerned about his brother. The judge's jury instructions could not have been misunderstood in the manner the defendant suggests.

3. On the day trial began the Commonwealth notified the defense of an inculpatory statement made to a friend of the victim ("You better tell your sidekick to watch his back, because we're going to kill him . . ."). The Commonwealth had learned of that statement from an interview with a friend, Thomas Perez, the previous day. Six days earlier the defense had asked the prosecution for any statements by Perez. Because the statement had been supplied tardily (albeit for excusable reasons), the judge suppressed the statement for use in the Commonwealth's direct case, reserving his discretion to let the statement be put to the defendant on cross-examination, were the defendant to take the stand. He did take the stand and the prosecution was permitted to ask the defendant if he had made the statement about killing the victim. By then fifteen days had passed, affording the defense time to investigate the statement attributed to the defendant by Perez. There was no prejudice and the judge acted within his discretion in permitting the defendant to be cross-examined about the subject.

4. Dr. Katsas, the medical examiner who performed the autopsy on the victim, was allowed, following a voir dire, to testify that the fatal shot had been fired from a distance of from thirty to sixty feet. It was well within the discretion of the judge to decide that Dr. Katsas had sufficient expert knowledge, though not a ballistics specialist, to extrapolate from the nature of the wound the approximate distance from which the shotgun had been fired. *Commonwealth* v. *Medina,* 372 Mass. 772, 780-781 (1977). *Commonwealth* v. *Seit,* 373 Mass. 83, 91-92 (1977). *Commonwealth* v. *Burke,* 376 Mass. 539, 540-541 (1978).

*Judgment affirmed.*

*Wade M. Welch* for the defendant.
*Ellen Lewis Bane,* Assistant District Attorney, for the Commonwealth.